IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARK C. GYRION,

        Plaintiff,

v.    No. 04 C 5670

CITY OF CHICAGO, a municipal corporation, RICHARD M. DALEY, as Mayor of the City of Chicago; RICHARD A. RICE, as Commissioner of the Water Management Department of the City of Chicago; RICHARD KINCZYK, individually and as former First Deputy Commissioner of the Water Management Department of the City of Chicago; CHICAGO SUN-TIMES, INC., an Illinois corporation; TIM NOVAK, individually and as agent of Chicago Sun-Times, Inc.; STEVE WARMBIR, individually and as agent of Chicago Sun-Times, Inc.; and FRAN SPIELMAN, individually and as agent of Chicago Sun-Times, Inc.,

        Defendants.

## MEMORANDUM OPINION AND ORDER

This is an action arising out of the discharge of plaintiff Mark C. Gyrion from employment by the City of Chicago. Before the court are two motions to dismiss the complaint. The discharge came about because of Mr. Gyrion's alleged involvement in the City's Hired Truck Program ("HTP").

Mr. Gyrion sues the City of Chicago ("City"), its mayor, Richard M. Daley ("Mayor Daley"), Richard A. Rice, the Commissioner of the City's Water Management Department, and Richard Kinczyk, First Deputy Commissioner of the Water Management Department,

(collectively, the "City Defendants") under 42 U.S.C. § 1983, for violation of his civil liberty interest in his employment and deprivation of his right to due process of law under the federal and Illinois constitutions. He also sues Mr. Kinczyk for defamation per se and false light invasion of privacy (apparently on a theory of supplemental jurisdiction). A second group of defendants consists of Chicago Sun-Times, Inc., an Illinois corporation which publishes a daily newspaper of general circulation in Chicago ("Sun-Times"), and three parties who are all sued individually and as agents of the Sun-Times: Tim Novak, Steve Warmbir, and Fran Spielman. The members of the second group are sometimes referred to, collectively, as the "Media Defendants." No separate basis for jurisdiction is alleged as against any of the Media Defendants.[1]

Count I of the Complaint alleges that the City Defendants deprived Mr. Gyrion of his liberty interest in the pursuit of his calling because, on false grounds, it both terminated his employment as a City official and held a press conference in order to publish the reasons therefor. Count II of the complaint alleges that the City Defendants violated Mr. Gyrion's right to due process in that they took such actions without notice or affording Mr. Gyrion the

---

[1] Although the Media Defendants have not challenged subject matter jurisdiction, it is not clear upon what basis this court could have jurisdiction over the suit against them. Nevertheless, since the claims against them will be dismissed for failure to state a claim, I have not asked for supplemental briefing on the question of jurisdiction.

2

opportunity to clear his name. Counts III and IV are directed solely at Mr. Kinczyk and allege, respectively, defamation and false light privacy stemming from statements made by Mr. Kinczyk at the press conference. Count V is addressed to the Media Defendants and alleges that they committed the tort of false light privacy in their reportage of Mr. Gyrion's actions. The two groups of defendants have filed separate motions to dismiss.

## Factual Background

Prior to the events which gave rise to this case, the City was under close scrutiny by Chicago media in connection with the HTP. Questions were raised by the media as to possible self-dealing by City executives and workers, and criminal prosecutions have since been initiated by the United States Attorney in this district based upon the handling of the HTP.

Mr. Gyrion is a cousin of Mayor Daley. He was employed by the City in various capacities for a period of nineteen years and received numerous job promotions. In July 2001 he was promoted to the position of Projects Administrator for the Water Management Department. In early 2004 he was named by Mayor Daley as part of a "Dream Team" that was going to oversee operations and construction for the Department. That promotion would have brought him additional employee benefits including a raise in pay. One of the stories covered by Chicago media in connection with the HTP concerned the fact that Mr. Gyrion's mother-in-law Naomi Baker is the owner and

3

operator of JACZ Transportation Company, through which she is alleged to have bought trucks being sold by the City's Water Management Department and leased them back to the Department at a profit.

Mr. Gyrion alleges that he has never had an interest in JACZ or worked for that entity. He further alleges that prior to February 5, 2004, he was scheduled to be delegated responsibility over the Department's HTP, and that at meetings held prior to that date with Messrs. Rice, Kinczyk, and others, he informed those in attendance that he could not be involved with the HTP "in that he had relationships which were involved with the HTP," but that no one ever asked him to explain the relationships.

On February 6, 7, and 8, 2004, the Sun-Times published a series of articles (the "February Articles") which, Mr. Gyrion alleges on information and belief, were written by Messrs. Novak, Warmbir, and/or Spielman. The February 6th article makes specific reference to JACZ, the relationships between Mr. Gyrion and Mayor Daley, and Mr. Gyrion's relationship with Naomi Baker and states further: "The ties between a top city employee and a trucking firm in the Hired Truck Program is the latest example of the network of inside connections and clout that permeate the program." The article also states: "Mark Gyrion, a cousin of Mayor Daley, helps run the city Water Department, while Gyrion's mother-in-law has raked in hundreds of thousands of dollars renting dump trucks to the agency since 1998."

4

On February 9, 2004, Mr. Gyrion was summoned to Mr. Rice's office and told that his employment by the City had been terminated. Mr. Gyrion alleges that he had received no notice of any problem or issue relating to his employment with the City prior to his termination; that when Commissioner Rice first told Mr. Gyrion he was terminated, Mr. Rice gave him no reason for the termination nor any opportunity to discuss the allegations contained in the February Articles; and that when Mr. Gyrion asked for a reason, Mr. Rice told him he was being terminated for a "perception" based upon the February Articles and did not give him an opportunity to present a defense to the charge.

Within a few hours after the meeting in which Mr. Rice terminated Mr. Gyrion, Mayor Daley and Mr. Kincsyk conducted a press conference which was videotaped and later shown by CLTV, a Chicago cable television station. At the press conference, Mayor Daley denied knowledge of the details of the firing and referred questions to Mr. Kinczyk, who stated: "We fired Mark Gyrion because he betrayed the public trust, he betrayed the trust of myself and Commissioner Rice, and hasn't used good judgment, and that's it." Mr. Kinczyk also stated: "Ninety-nine percent of the people that are employed by my department are good honest people, because I have one foul ball is not an indictment of my entire department." Mr. Kinczyk also stated in response to a question that Mr. Gyrion should have come to him and told him that "I've got some exposure in this." Mr. Gyrion alleges that no one from the City gave him an opportunity

5

to respond to the statements made by Mr. Kinczyk during the press conference, which further placed him in a false light and defamed him; that Mr. Gyrion has suffered "diminished and otherwise lost wages, along with diminished ability to obtain certain employment based upon said termination and the conduct" of the defendants.

I.

On a motion to dismiss, I accept all well-pleaded allegations in the complaint as true. *Turner/Ozanne v. Hyman/Power*, 113 F.3d 1312, 1319 (7th Cir. 1997), and grant the motion only if the plaintiff can prove no set of facts to support the allegations in his claim. *Strasberger v. Bd. Of Educ.*, 143 F.3d 351, 359 (7th Cir. 1998). In federal practice the function of a civil complaint is to give the defendant adequate notice of the elements of the claims made and not to furnish evidentiary detail. I do not rule on the merits of Mr. Gyrion's claims against the City Defendants, and nothing herein contained should be so construed. I simply hold that as to those defendants he has adequately alleged the elements of his claims. I dismiss his claim against the Media Defendants with prejudice, because I find the defect in his pleading of that claim to be so fundamental that I do not see how it can be cured.

II. The Motion of the City Defendants

In Count I of his complaint, Mr. Gyrion alleges that the City Defendants deprived him of his liberty interest to pursue his employment and calling.

6

*Official Capacity Claims.* The City Defendants contend that Mayor Daley and Mr. Rice are sued in their official capacities only, and that a suit against a municipal official in his official capacity is construed as a suit against the municipality, thus making Mr. Gyrion's claims against the Mayor and Mr. Rice redundant. This argument is incorrect when viewed in the light of *Owen v. City of Independence*, 445 U.S. 622, 647-48 (1980)(members of city council not immune from a section 1983 suit against the city for liberty interest in reputation without due process). See *Sims v. City of New London*, 738 F.Supp. 638, 641-42 (D.Conn. 1990)("(t)he Supreme Court has specifically held . . . that plaintiffs may file suit against both a municipality and its agents in their official capacities.").

*Failure to Allege Violation of a Municipal Policy.* The City Defendants argue that Mr. Gyrion has failed to identify what municipal policy was violated by their conduct. They also contend that the discretion to make hiring and firing decisions does not amount to "policy making authority." However, the plaintiff has alleged that his discharge and the press conference which publicized it were carried out by public officials who had "final policy making authority," and that is a sufficient basis for an action of this kind. *Looper Maintenance Service Inc. v. City of Indianapolis*, 197 F.3d 908, 912 (7th Cir. 1999). See also, *Yeksigian v. Nappi*, 900 F.2d 1001, 1004 (7th Cir. 1990)(relying on *Anderson*

7

v. *Gutschenritter*, 836 F.2d 346,349 (7th Cir. 1988) which held that a municipality "can be held liable under section 1983 for a single decision by municipal policy makers if the decision to adopt a particular course of action is directed by those who establish governmental policy.").

*The Scope of Plaintiff's Liberty Interest*. The City Defendants argue with respect to Count I that the "liberty interest" asserted by the plaintiff does not embrace the right to keep his former job or to be a member of the "Dream Team," and that he should be required to provide a more definite statement that identifies his chosen occupation. I find, however, that Mr. Gyrion has sufficiently described his career so that the City is apprized of his calling. He was a long time municipal manager of motor vehicles and maintenance. He claims that he would prefer to find employment in his field. He also claims that the conduct of the City in abruptly terminating his employment and then publicizing his firing in terms that were false and stigmatizing has deprived him of the ability to find work in his chosen field. Further, he alleges in Count II that the City, in violation of his rights of due process, took these actions without giving him notice or providing him the opportunity to clear his name. Under Seventh Circuit and other authority, these allegations are sufficient to survive a motion to dismiss.

In *Lawson v. Sheriff of Tippecanoe, Ind.*, 725 F.2d 1136, 1139 (7th Cir. 1984), the plaintiff was fired from her job as a police radio dispatcher because her husband had just been arrested for alleged participation in an interstate automobile theft ring and her job gave her access to automobile registration information. In reversing a grant of summary judgment for the defendant, the court noted: "And when a state fires an employee for stated reasons likely to make him all but unemployable in the future, by marking him as one who has lost his job because of dishonesty or other job-related moral turpitude, the consequences are so nearly those of formally excluding him from his occupation that the law treats the state's action the same way, and insists that due process be provided." Whether the remarks of Mr. Kinczyk at the press conference attributed moral turpitude to plaintiff and stigmatized him are not questions that can be decided on a motion to dismiss.

*Defamation per se.* Count III of the complaint pleads an action for defamation *per se*. Defamation actions provide redress for false statements of fact that harm reputation. The law distinguishes between statements that are defamation *per se* and those that are defamation *per quod*. The difference in consequences between the two types of defamation is that a plaintiff who has suffered defamation *per se* does not have to plead or prove special damages (i.e., damages specifically caused by the defamatory statement) or actual malice, while a party complaining of

9

defamation *per quod* must plead and prove those elements. *Muthuswamy v. Burke*, 646 N.E.2d 618 (Ill.App.Ct. 1995). In Illinois, there are five recognized categories of defamatory statements that are considered actionable *per se*: 1) statements imputing commission of a criminal offense; 2) those imputing infection with a loathsome communicable disease; 3) those imputing an inability to perform or want of integrity in the discharge of duties of office or employment; 4) those that prejudice a party, or impute lack of ability in his or her trade, profession, or business; and 5) those imputing adultery or fornication. *Brennan v. Kadner*, 814 N.E.2d 951 (Ill.App.Ct. 2004).

Mr. Kinczyk argues that as a matter of law the statements made by him in the press conference do not fall within any of the categories of defamation *per se*. I disagree. Mr. Kinczyk was asked by Mayor Daley to answer reporters' questions about Mr. Gyrion's termination, and Mr. Kinczyk stated: "We fired Mark Gyrion because he betrayed the public trust, he betrayed the trust of myself and Commissioner Rice, and hasn't used good judgment, and that's it." This statement fits neatly into the third category of defamation *per se* set forth in *Brennan*, supra. Nevertheless, Mr. Kinczyk asserts several reasons why his statement to the press should not be so characterized. All are without merit.

*The Innocent Construction Rule.* Mr. Kinczyk argues that the statements he made concerning Mr. Gyrion are shielded by the

10

Illinois innocent construction rule, which holds that statements will not be construed as defamation *per se* if they can reasonably be construed innocently or reasonably interpreted as referring to someone other than plaintiff. The procedure for determining whether or not the rule applies was spelled out by the Illinois Supreme Court in *Chapski v. Copley Press*, 442 N.E.2d 195, 199 (1999) when it held that

> (a) written or or oral statement is to be considered in context, with the words and the implications therefrom given their natural and obvious meaning; if, as so construed, the statement may reasonably be innocently interpreted as referring to someone other than the plaintiff it cannot be actionable *per se*. This preliminary determination is to be resolved by the court in the first instance; *whether the publication was in fact understood to be defamatory or to refer to the plaintiff is a question of fact for the jury should the initial determination be resolved in favor of the plaintiff.* (emphasis added)

The accusations made by Mr. Kinczyk do not meet the requirements of the innocent construction rule and that the issues of defamatory meaning and reference to the plaintiff must be submitted to the jury. *Chapski v. Copley Press*, 442 N.E.2d 195, 197 (Ill.App.Ct. 1982). The cases Mr. Kinczyk cites in favor of application of the innocent construction rule are distinguishable. *Musthswamy*, 646 N.E.2d 618, while it mentioned the rule, did not turn on its application, but rather found that the remarks of the defendant, chief of medicine and a supervisor of plaintiff at the hospital which employed both parties, were the subject of a qualified privilege because they were made in an official meeting at which

11

the plaintiff was present and had an opportunity to defend his conduct. Here, Mr. Kinczyk's remarks about Mr. Gyrion were made in a press conference.

Nor do Mr. Kinczyk's statements fall within the parameters of *Valentine v. North American Co. for Life & H. Ins.*, 328 N.E.2d 265 (Ill.1974) or *Dubinsky v. United Airlines Master Exec. Council*, 708 N.E.2d 441, 447 (Ill.App.Ct. 1999). In those cases, statements thet the plaintiff was a "lousy agent" (*Valentine*) or a "crook" (*Dubinsky*) were held not to be defamatory per se because, given the circumstances in which they were made, they could reasonably be construed as statements of unverifiable opinion rather than as statements of fact. By contrast, the statement that the present plaintiff, a long time public official, betrayed the public trust and the trust of his supervisors, when coupled with a statement that characterizes the plaintiff as a "foul ball" compared to 99 percent of his colleagues who are "good honest people," is not susceptible of any interpretation except that Mr. Gyrion had shown a conspicuous lack of integrity in the discharge of his duties of office or employment.

Mr. Kinczyk argues that the innocent construction rule applies because it is not clear that the remarks he made at the press conference were aimed at Mr. Gyrion and not someone else. A transcript of the press conference is attached to the Complaint as Exhibit "D" and demonstrates the lack of merit in this contention.

Mr. Gyrion was the focus of the press conference, and the statements in question were aimed at him.

*Constitutionally Protected Opinion.* Mr. Kinczyk argues that some of the statements he made about Mr. Gyrion at the press conference were constitutionally protected opinion as opposed to actual verifiable facts. In so doing, Mr. Kinczyk carefully avoids bringing up the words he used which accused Mr. Gyrion of betraying the public trust and the trust of his supervisors. That statement alone meets the requirement for defamation *per se*. Moreover, considering that statement together with one of Mr. Kinczyk's other comments made at the press conference, it is clear that Mr. Kinczyk was talking about verifiable facts. Mr. Kinczyk told the press that Mr. Gyrion "should have come forward and told us [that Mr. Gyrion's mother-in-law was involved in the HTP], right after this thing broke, and he didn't." Mr. Gyrion pleads, and for purposes of this motion his allegation must be taken as true, that he informed Commissioner Rice, Mr. Kinczyk and others in the Department of Water Management, *prior* to the publicity the HTP received in the press, that "he could not be involved with the HTP because he had relationships which were involved with the HTP." That allegation is sufficient to withstand a motion to dismiss, notwithstanding Mr. Kinczyk's defense of constitutionally protected opinion.

*The Due Process Claim.* The City Defendants, citing *Johnson v. Martin*, 943 F.2d 15 (7th Cir. 1991), contend that to recover damages for deprivation of due process rights stemming from an unwarranted termination and concomitant false publicity, a plaintiff must plead that he was stigmatized by the defendant's conduct, that the stigmatizing information was publicly disclosed, and that the plaintiff suffered a tangible loss of other employment opportunities as a result. This is true, but under a notice pleading standard, Mr. Gyrion's pleading in Count III satisfies those requirements. Moreover, in *Johnson*, supra, there was no publicity given to the reasons for the plaintiff's termination as a probationary police officer; the reasons for discharge were only noted in the plaintiff's personnel file which was neither disseminated nor made available for public inspection.

*The Defenses of Absolute and Limited Immunity.* The City Defendants contend that they have absolute or, at the very least, limited immunity from suit and liability with respect to Mr. Kinczyk's statements at the press conference. Both absolute and limited immunity are affirmative defenses which a defendant must plead and prove. Defendants' arguments in support of immunity depend on facts not admitted in the complaint. Neither therefore may be decided on a motion to dismiss. *Roberts v. Board of Education*, 25 F.Supp.2d 866, 870 (N.D.Ill. 1998)(Bucklo, J.).

*The False Light Privacy Claim.* Mr. Gyrion alleges in Count IV a claim for false light privacy against Mr. Kinczyk. The elements of that tort are: 1) that the plaintiff was placed in a false light before the public as a result of the defendant's action; 2) that the false light in which he was placed would be highly offensive to a reasonable person; and 3) that the defendant acted with actual malice. *Brennan v. Kadner*, 814 N.E.2d 951, 959 (Ill.App.Ct. 2004). I have already found that the allegations of the complaint are sufficient to state a claim for defamation *per se*; thus, it follows that from a pleading standpoint the first and second requirements of false light privacy have been met.

As for the third requirement, actual malice, that term is construed to mean publication of a defamatory statement with actual knowledge of its falsity or with reckless disregard of the truth. Id. If, as Mr. Gyrion alleges, he advised Commissioner Rice, Mr. Kinczyk, and others in the Department of Water Management that he could not be involved with the HTP "in that he had relationships which were involved with the HTP," and they failed to question him about the relationship, Mr. Kinczyk could have acted in reckless disregard of the truth.

I therefore deny the motion to dismiss of the City Defendants in all respects.

III. The Motion of the Media Defendants

Count V of the Complaint is the only count which seeks relief against the Media Defendants, and its sole theory of liability is false light privacy. Here, Mr. Gyrion seeks damages for the February Articles and for certain articles that appeared subsequently in the Sun-Times (the "Additional Articles"). Significantly, Mr. Gyrion does not challenge the truth of any factual assertion made in the article but instead alleges that the Media Defendants "exaggerated certain statements and/or the presentation of same."

The February 6, 2004 article bore the headline "Family ties bind city, Hired Trucks." Column headings include "CLOUT ON WHEELS" and "Top Water Department worker has in-law with trucking contract." Mr. Gyrion is the subject of these captions. The article acknowledges that the ownership of JACZ Transportation by Mr. Gyrion's mother-in-law "does not break city regulations." The article mentions a political contribution made by Mr. Gyrion and shows photos of homes occupied (separately) by Mr. Gyrion and his mother-in-law. The article also states that Mr. Gyrion's wife said her husband would not talk to a reporter and referred all calls to her mother. The February 6, 2004 article does imply that Mr. Gyrion's mother-in-law owes her lucrative HTP contracts to her relationship with Mr. Gyrion, but that is a constitutionally protected expression of opinion about a matter of public interest.

16

The February 7, 2004 Sun-Times article bore the headline "Water employee's promotion put on hold" and column headings stated "His mother-in-law had lucrative Hired Truck deal" and also uses the caption "CLOUT ON WHEELS." This article stated that a "hefty promotion" for Mr. Gyrion had been "put on hold" by the City following the disclosure made in the previous day's Sun-Times article; that a Water Management spokesman had stated that a decision had been made to transfer Mr. Gyrion to the Bureau of Water Supply "pending a review of his circumstances"; and also stated that (previously) Mr. Gyrion had been "placed in charge of support services, a clout-heavy role that would allow him to control equipment, warehouses, and, most importantly, trucks." Mr. Gyrion does not challenge the truth of any of these assertions.

The February 8, 2004 article, again using the column heading "CLOUT ON WHEELS", repeated some of the factual assertions made in the articles published on the preceding two days and added statements that one of the trucks leased to the City by JACZ Transportation had been sold by Mr. Gyrion in his capacity as a Water Management official for the City to a dealer and purchased three days later by his mother-in-law; that JACZ had previously run afoul of city regulations when it leased a truck owned by Mr. Gyrion's company M.A.A.R.K. to the city; that Mr. Gyrion had "also got the ball rolling on a deal that put a city truck in his mother-in-law's hands"; that Mr. Gyrion's home was roughly twice the size

of most of its neighbors, that his mother-in-law's home was slightly larger and dwarfed every other house on the block; that both homes had been built since his mother-in-law got into the HTP; and that Mr. Gyrion was the son of Mayor Daley's aunt.

The "Additional Articles" published in the Sun-Times, copies of which are attached to the complaint as exhibits, add further details concerning Mr. Gyrion's handling of truck dispositions by the City and in whose hands (including his own, through M.A.R.K.) the trucks were ultimately placed.

Illinois law requires that a plaintiff claiming false light privacy must specify a statement or assertion made by the defendant that was false. *Hurst v. Capital Cities Media, Inc.*, 754 N.E.2d 429, 433 (Ill.App.Ct. 2001)("Absent some allegation as to what specific statement was false, a claim based on false-light invasion of privacy fails to satisfy a basic element of the cause of action."). Plaintiff has not characterized any of the numerous statements made about him by the Media Defendants as false. His only allegation concerning the statements is that they were "exaggerated". I grant the Media Defendants' motion to dismiss the complaint as to them with prejudice.

**ENTER ORDER:**

*Elaine E. Bucklo*

**Elaine E. Bucklo**
United States District Judge

Dated: May 4, 2005

18