IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARK C. GYRION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 04 C 5670 |
| | ) |
| CITY OF CHICAGO, a Municipal | ) |
| Corporation; RICHARD M. DALEY, | ) |
| Individually; and RICHARD KINCZYK, | ) |
| Individually, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mark Gyrion ("Gyrion") worked for the City of Chicago (the "City") for nearly twenty years until he was terminated in February of 2004. The circumstances of that termination form the basis of his complaint against the City, Richard Kinczyk ("Kinczyk") (the former First Deputy Commissioner for the City's Department of Water Management) and Mayor Richard M. Daley ("Mayor Daley"). Mr. Gyrion alleges that the defendants violated his right to due process when he was terminated without a name-clearing hearing and when Kinczyk and Mayor Daley made allegedly defamatory statements about his termination during a televised press conference. This court has previously dismissed some of his claims, but what remains are constitutional claims and claims under 42 U.S.C. § 1983 alleging violations of Gyrion's right to due process (Counts I and II of Gyrion's amended complaint). The parties have brought cross-motions for summary judgment. For

the reasons set forth below, I deny Gyrion's motion and grant the defendants' motion for summary judgment.[1]

I.

Summary judgment is appropriate where the record and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir. 1999); Fed. R. Civ. P. 56©. I must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Here, the undisputed facts are as follows: Gyrion worked for the City beginning 1985 until he was terminated in 2004. During that time he worked in different positions and for different departments, most recently as a projects administrator in the Water Management Department. His responsibilities included determining which department vehicles should be traded in to private dealers, and which city vehicles should be used on a particular day. The Water Management Department, formed by a merger of the Water and Sewer departments, was still new in 2004, and department leaders

---

[1] As the undisputed facts and relevant legal standards below demonstrate, there is simply no basis to grant summary judgment for Mr. Gyrion; the real question is whether the defendants are entitled to summary judgment. For that reason, although this court has before it cross-motions for summary judgment and considers arguments raised in both motions, this opinion primarily addresses the merits of defendants' motion.

were in the process of determining responsibilities in the new department. At that time, it was discussed that Gyrion might have some responsibility over the Hired Truck Program ("HTP"), a City program to use outside contractors to perform certain municipal public works tasks instead of municipal workers and vehicles. Gyrion alleges that at those meetings he told those present (including Kinczyk) that he had "relationships" with the HTP and should not have any responsibility over it.[2] Gyrion claims he was not given responsibility over HTP because he had made that disclosure.

Gyrion also claims that no one within City government ever asked him to explain what he meant by having "relationships" with the HTP. The "relationships" to which Gyrion referred may have been the fact that his mother-in-law owned a transportation company which participated in the HTP. The City was that company's sole client. Gyrion's wife also worked for that transportation company. In addition, Gyrion owns a snowplowing and trucking company which had leased a truck to his mother-in-law's company knowing that the truck would be used in the HTP, although Gyrion received only a nominal amount of money for the lease. Gyrion contends that he did not report the details of any of these relationships to the City because he did not believe he was required to do so.

---

[2] Several city employees testified in their depositions that, although they were present at those meetings, they do not recall Gyrion ever making that statement.

3

In early February of 2004 the *Chicago Sun-Times* ran a series of articles about the HTP which discussed Gyrion's relationship to the HTP and to Mayor Daley (they are second cousins). In response to these articles Kinczyk and others investigated further and discovered that Gyrion and his mother-in-law had both purchased former City vehicles from a dealer. In his capacity as a City employee Gyrion had helped determine that those vehicles should be traded in to the dealer.[3] Based on this information, defendants claim that Water Management Department officials determined that Gyrion should be terminated. Defendants claim that Mayor Daley was informed of the decision after it had been made. Gyrion argues that Mayor Daley was aware of Gyrion's determination because he ordered it to take place in order to demonstrate to the public that he was addressing corruption.

On the morning of February 9, 2004, Gyrion was summoned to the office of the Commissioner of Water Management and told he was being terminated. Gyrion alleges that he was told he was being terminated for the "perception" his HTP relationships created, but defendants deny Gyrion was given this explanation. Defendants argue that at this meeting Gyrion was given an opportunity to explain himself, but Gyrion argues that at the meeting he was told

---

[3]Gyrion's briefs emphasize that other City employees had to approve his determinations as to which vehicles should be traded in, and that the vehicles were traded in to dealers through a bid process to ensure that the City received fair value for them.

4

it was "too late" to do anything because the decision had already been made. Later that day, Kinczyk and Daley appeared at a televised press conference. A reporter asked about Gyrion and Daley revealed his termination and referred questions to Kinczyk. Kinczyk stated that Gyrion was terminated because "he betrayed the public trust," betrayed the trust of Water Management Department officials, and "hasn't used good judgement."[4] When asked if Gyrion should have disclosed his HTP relationships, Kinczyk stated, "I don't know, I mean, logically, he was expected to come to me and say, you know what, I've got some exposure in this, Rich, and I've got a problem. And he didn't do that." When asked how Gyrion had betrayed the public trust, Mayor Daley stated, "As Rich Kinczyk said, that's basically what it is."

Since being terminated by the City Gyrion has continued working for his own company as a truck driver. He also applied without success for two jobs with other companies, although he has not explained for what positions he applied and why he was not offered those positions. Gyrion contends that his company also lost business from a customer that was concerned that working with Gyrion would prevent the customer from obtaining business from the

---

[4]Kinczyk was also asked, "What do you do in the future, if I can ask you, if you were the Mayor now, what do you do with a whole staff of people to make sure. . . ." and he responded, "99% of the people that are employed by my department are good honest people, because I have one foul ball is not an indictment on my entire department, and I will definitely ask people more detailed question next time I make a change like that."

City. This customer has continued to work with Gyrion's company, although the company has earned less from that customer than in some previous years.

II.

Even taking the facts in the light most favorable to plaintiff, and drawing all reasonable inferences on his behalf, there are critical flaws with plaintiff's claims. Both of Gyrion's claims rest on the argument that the City violated his occupational liberty interest.[5] Gyrion acknowledges that he had no substantive property right to his position with the City,[6] but argues instead he had a right to procedural due process with respect to his occupational liberty interest. Occupational liberty is "the liberty to follow a trade, profession, or other calling." *Wroblewski v. City of Washburn*, 965 F.2d 452, 455 (7th Cir. 1992). That liberty interest can be violated in two ways. First, it is threatened when "the individual's good name, reputation, honor or integrity are at stake by such charges as immorality, dishonesty,

---

[5]The first count of his amended complaint is a constitutional tort claim under § 1983, the United States Constitution and the Illinois Constitution. The second count is styled as a "due process" claim under the United States Constitution and the Illinois Constitution. Both seek identical remedies: reinstatement to employment with the City, damages, and fees and costs.

[6]*See, e.g.*, *Deen v. Darosa*, 414 F.3d 731, 734 (7th Cir. 2005) (noting that a property interest must be "defined by existing rules or understandings that stem from an independent source such as state law"). Gyrion was an at-will employee with the City and had no expectation otherwise.

alcoholism, disloyalty, Communism or subversive acts." *Munson v. Friske*, 754 F.2d 683, 693 (7th Cir. 1985). Second, it is threatened when "the state imposes a stigma or other disability on the individual which forecloses other opportunities." *Id.* See also *McMath v. City of Gary, Indiana*, 976 F.2d 1026, 1031 (7th Cir. 1992). In either case, Gyrion must show that 1) he was stigmatized by defendants' conduct, 2) the stigmatizing information was publicly disclosed, and 3) he suffered "a tangible loss of other employment opportunities as a result of public disclosure." *Id.* (citing *Johnson v. Martin*, 943 F.2d 15, 16 (7th Cir. 1991)); *Colaizzi v. Walker*, 812 F.2d 304, 307 (7th Cir. 1987). A "tangible loss" of employment opportunities is a high standard; it requires more than proof that a plaintiff is "somewhat less attractive to some other employers." *Munson*, 754 F.2d at 693 (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 574 (1972)). Likewise, "[a] liberty interest is not implicated where the charges merely result in reduced economic returns and diminished prestige, but not permanent exclusion from or protracted interruption of employment." *Munson*, 754 F.2d at 693 (citing *Stretten v. Wadsworth Veterans Hosp.*, 537 F.2d 361, 366 (9th Cir. 1976)).[7] Occupational liberty only

---

[7] The Seventh Circuit has repeatedly emphasized that this is a high standard, which requires that the circumstances of the employee's discharge effectively "blacklisted" the employee or made it "virtually impossible" for him to find new employment. See *Colaizzi*, 812 F.2d at 307; *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001); *Olivieri v. Rodriguez*, 122 F.3d 406, 408 (7th Cir.

provides the right to a chosen occupation, not to a "specific job." *Wroblewski*, 965 F.2d at 455. In making this distinction, courts have separated the "occupation" of police officer from the "job" of police lieutenant and the occupation of psychologist from a job on a particular hospital's medical staff. *Illinois Psychological Ass'n v. Falk*, 818 F.2d 1337, 1344 (7th Cir. 1987)(citing *Bigby v. City of Chicago*, 766 F.2d 1053, 1057 (7th Cir. 1985)).[8]

Gyrion argues that his chosen occupation is "management." He has presented no authority from which this court could conclude that "management" is an occupation for purposes of the occupational liberty interest analysis. Every conceivable occupation has "management," and this term reflects a hierarchical position within a particular company or field. In this way, it is a "privilege attached to an occupation" and not an occupation itself. *See Illinois Psychological Ass'n*, 818 F.2d at 1344 (explaining that a psychologist "hospital staff" position was not an occupation, but a potential privilege of the occupation of psychology).

---

1997); *Lashbrook v. Oerkfitz*, 65 F.3d 1339, 1348-49 (7th Cir. 1995).

[8]The occupational liberty interest is procedural rather than substantive, so the government may impinge upon the interest as long as it first affords the affected employee notice and an opportunity to be heard. *Strasburger v. Bd. of Educ., Hardin County Cmty. Unit Sch. Dist.*, 143 F.3d 351, 356 (7th Cir. 1998) (citing *Codd v. Velger*, 429 U.S. 624, 627 (1977)).

Even assuming that "management" can be considered an occupation and taking the facts in the light most favorable to Gyrion, Gyrion cannot show that he has been excluded from his occupation. Gyrion contends that he is not currently working in management, and that he is currently driving a long-haul fuel truck for his company. He has applied unsuccessfully for jobs at Aramark Corporation (in its maintenance department) and Leopold Construction (as a projects manager), although he has no direct evidence that he was not hired by those two companies because of the statements made by the defendants.[9] Gyrion argues that "common sense" alone suggests that comments similar to the defendants' would blacklist an employee and give him "a difficult time finding another job with a different municipal employer." He also suggests, without evidence, that the City has a "Code of Silence" which operates to keep him from finding another job with the City. A reliance on common sense, however, does not relieve Gyrion of his burden of showing that he is now "virtually unemployable" in management, and applying for one management position does not meet

---

[9]At oral argument and in his briefs Gyrion also suggests that the fact that a major client of his company reduced its business with the company as a direct result of his termination from the City is somehow evidence that Gyrion has been unable to find employment. This is related to Gyrion's damages and not to his ability to find work in his chosen profession. In addition, although Gyrion's company may have lost some business as a result of his termination, this is not enough to show that he suffered "a tangible loss of employment opportunities." *Munson*, 754 F.2d at 693 (holding "reduced economic returns" not sufficient to establish deprivation of occupational liberty interest).

this burden either.[10] In addition, whether or not he could be hired by the City or another municipal employer is irrelevant; Gyrion's occupational liberty interest does not afford him a "right" to municipal employment.

### III.

Because Mr. Gyrion cannot meet this element of his claim, this court need not address the other required elements of his causes of action (such as whether the statements defendants made were stigmatizing and whether the city is liable under plaintiff's *Monell* theory) and the other arguments raised by the parties in their briefs (such as whether the individual defendants are entitled to qualified immunity). I deny plaintiff's motion for summary judgment, and grant defendants' motion. This case is therefore dismissed.

**ENTER ORDER:**

*Elaine L. Bucklo*

**Dated:** May 4, 2006

**Elaine E. Bucklo**
United States District Judge

---

[10] Gyrion cites a previous case from the Northern District of Illinois, *Coleman v. Lane*, 949 F. Supp. 604, 611 (N.D. Ill. 1996), to support his contention that he has done enough to show that he was unable to find a different job. The discussion in that case addressing the reasonableness of efforts to find employment dealt with the mitigation of damages and not the high requirement for a showing that an employee is now "virtually unemployable." *Id.* at 609-613. Further, that case cited an opinion from the Seventh Circuit in which the court reduced a backpay award for an employee that spent at most "a few hours a week" for a two-year period looking for alternative employment. *Id.* at 608 (citing *Payne v. Sec. Sav. & Loan Ass'n, F.A.*, 924 F.2d 109, 111 (7th Cir. 1991)). Here, where Mr. Gyrion only took the time to submit two resumes, it is impossible for him to make that showing.